CITY OF GREENVILLE *v.* LEWIS P. LAURENT ET AL.

1. MUNICIPAL CHARTER.  *Construction.* '

   A municipal charter should be so construed as to carry out the legislative intent; and effect, if possible, must be given to every part thereof.

2. SAME.  *Power to contract debts.*

   Municipal charters, like those of other corporations, are not to receive a latitudinarian construction; and, if there be doubt as to a legislative grant therein of power to contract debts, the doubt must be resolved against the power.

FROM the chancery court of Washington county.

HON. A. H. LONGINO, Chancellor.

The complainants, appellees, in addition to being citizens and taxpayers of Greenville, were engaged in carrying on the business of butchers and vendors of fresh meats therein. The ordinances referred to in the opinion established certain boundaries as defining market limits, and prohibiting, under penalties, the selling of fresh meat by retail within such limits, save in the markethouse acquired from Mrs. Alexander under the contract mentioned in the opinion.

*A. Lewenthal, Jr.*, for appellant.

The appellees claim, concealing their real purpose, that the principal point of contention is the construction of the fifty-seventh section of the city charter. They care nothing for the contract with Mrs. Alexander, except in so far as they think they see in it an escape from the ordinance requiring the sale of fresh meats to' be in the markethouse. The appellant does not shun meeting them on their proposed field of battle, but before going direct to the section of the charter invoked, desires to consider some of the propositions involved. A difference of

opinion entertained by the witnesses as to the value of the property, cannot be reviewed by this court, and cannot cause a cancellation of the contract. The appellant shows that the property was the cheapest offered, and the price therefor was reasonable. This should end the matter of value. Equity does not take kindly to stale suits. The long acquiescence of appellees, waiting, as they did, until after alterations in the building and until installments of the purchase price had been paid by the city, should estop appellees from insisting upon the litigation of the question of the power of the city to make the purchase, especially as it is apparent that the "butchers" are only incidentally interested. The city unquestionably has power to "regulate markets," and this authorizes a prohibition of the sale of market commodities save at a designated place or places. Complainant butchers ought not to be allowed, in resisting a valid ordinance fixing the places where their sales may be made, to question the city's title to the land upon which sales of their meats are permitted. But the appellees are also citizens and taxpayers of the city, and we suppose it right for the court to construe the section of the charter for them as well as for anybody else. Entering upon its consideration, we find that section 57 constitutes a limitation upon the powers of appellant to contract debts, of course, but the contention arises over the extent of the limitation. Appellees contend that the amount of money on hand must be enough to pay the entire debt named in the contract, while appellant claims that the section requires only an amount sufficient to meet the warrant at the time ordered to be issued.

It will not be denied that the correct answer lies in the clause, "A sufficient amount of money to pay the same," and it must further be admitted that if the word "debt" had been used, instead of "same," the use of the definite term would describe in plain language the amount of money necessary to have on hand when the contract was made or the warrant is ordered to be issued. To what does the word "same" refer? It

must refer to "warrant" in the preceding line, for on this ground alone can its use be justified. Unless used for emphasis, it is employed only to avoid close repetition of the noun for which it stands, and relates back to the noun nearest to it with which it makes sense. Eliminate "same," and substitute "warrant" therefor, and you will see how awkward the sentence will be. Had it been the intention to mark the danger line at the general term "debt," there would have been no need to use "same," for the word debt could have been repeated at that place without violating any rule of grammar or of English composition. The simplicity of this argument should commend it, for it merely invokes a simple rule of grammatical construction to analyze a complex sentence. This position gains additional force when we consider the clause, "That may be properly applied to the payment of said warrant." Had it been the purpose of the legislature to mark the danger line by the amount of debt contracted, this clause would read, "That may be properly applied to the payment of said warrant or debt." In fact, the word "warrant" would have been omitted, because it is a specific, of which "debt" is the general term, and the use of the latter would naturally have embraced the former. Therefore, the use of the restrictive term shows that the prohibition was directed against the issuance of warrants, and the amount to be in the treasury was to be sufficient to pay the same. ·

The evident object was to prevent speculations in warrants, and therefore it is prohibited to issue any warrant unless the money be on hand to take up the same. It will prove interesting to read § 2942 of the code, and note the difference of language employed there and that used in section 57 of the charter. It is a remarkable fact that, although the books are full of cases construing such limitations upon municipalities to contract debts, no statute has been found in language in anywise similar to that of the section under consideration. Is it not logical to say that difference in terms indicates a difference in purpose?

*William Griffin,* on same side.

The court below erred in decreeing that the market house ordinance of the city of Greenville, in "the establishment of said market house, and the adoption of said ordinance, are in restraint of trade, and, therefore, void." Appellant's charter conferred on it the power "to establish and regulate markets and market houses." Charter of the city of Greenville, Laws 1886, p. 521; Beach on Public Corporations, secs. 1267, 1268; Dillon on Municipal Corporations, secs. 141, 382, 384, 386, 388, and 389; *Sykes* v. *Columbus,* 55 Miss., 139; *Porter* v. *Water Valley,* 70 Miss., 560. The ordinance in no sense creates a monopoly, nor does it attempt to prohibit the sale of meats after market hours, and within the market house limits, nor does it attempt to prohibit sales without the market house limits at any hour of the day. Dillon on Municipal Corporations, sec. 386; *Shelton* v. *Mobile,* 68 Am. Dec., 143 (30 Ala., 540); notes to *Robinson* v. *Franklin,* 34 Am. Dec., 637; *Ash* v. *People,* 83 Am. Dec., 740 (11 Mich., 347); *Caldwell* v. *Alton,* 85 Am. Dec., 282 (33 Ill., 416); *New Orleans* v. *Stafford,* 27 La. Ann., 417; *Ex parte Canto,* 57 Am. Rep., 609 (21 Tex. Ct. App., 61); *Jacksonville* v. *Ledwith,* 21 Am. St. Rep., 558 (26 Fla., 163); *Foster* v. *Police Commissioners,* 41 Am. St. Rep., 194 (102 Cal., 483); Beach on Public Corporations, sec. 1268; Tiedeman's Limitation of Police Powers, 312 and 313. The appellant has the right to demand of the lessee of market stalls a reasonable compensation therefor. Dillon on Municipal Corporations, secs. 388, 389; *Ex parte Canto,* 57 Am. Rep., 609; *Cincinnati* v. *Buckingham,* 10 Ohio, 257; *Dubuque* v. *Leiber,* 11 Iowa, 407; *Dubuque* v. *Miller,* 11 Iowa, 584; *Dount* v. *Beornbay,* 15 La. Ann., 377; *Woelpepper* v. *Philadelphia,* 38 Pa. St. Rep., 203; *Yates* v. *Milwaukee,* 12 Wis., 673. The ordinance is entitled to every presumption as to its constitutionality and validity in every respect, unless the contrary is clearly shown. Beach on Public Corporations, sec. 514 *et seq.,* and sec. 994; *Austin* v. *Austin City Cemetery,* 47

Am. St. Rep., 114 (87 Tex., 330); 15 Am. & Eng. Enc. L., 1046.

Is the extent of the indebtedness incurred by the city in the purchase of the market house violative of section 57 of appellant's charter? The evidence discloses that there was, at all times, ample funds in the city treasury to pay the installments of purchase money as they fell due each month. The indebtedness incurred by the city for the purchase of the market house property was not a present debt within the meaning of section 57 of the charter. Appellant has been permitted to expend large sums of money in making the monthly payments, and even though the contract might have been *ultra vires* in its inception, the status of the parties cannot be restored by reason of laches. Beach on Pub. Cor., sec. 1643; High on Injunc., sec. 1260; 10 Am. & Eng. Enc. L., 862 and note; *Thomas* v. *Woody*, 33 Am. Rep., 156; *East St. Louis* v. *E. St. L. G. L. Co.*, 38 Am. Rep., 97; notes to *City of Logansport* v. *Uhl*, 50 Am. Rep., 117; *Hutchinson* v. *Board of Commissioners*, 30 Am. St. Rep., 281; *Hitchcock* v. *Galveston*, 96 U. S., 341; *Daniels* v. *Turney*, 102 U. S., 415; *Carlysle L. & P. Co.* v. *Carlisle*, 31 Ill. App., 325; 2 Gen. Digest of U. S., p. 1291; 6 Gen. Digest U. S., p. 1396; 15 Laywers' Rep. Anno., 401.

*J. H. Wynn,* for appellees.

The purchase of Mrs. Alexander's land on a credit, when there was not sufficient money in the treasury to pay for the same, was a direct violation of the charter of the city, which not only made such act unlawful, but makes it a felony. Acts 1886, p. 536, sec. 37. "All contracts which are in violation of law or public policy are void." George's Digest, p. 147, sec. 22. And all contracts based on it are illegal and void. *Ib.*, sec. 23. Where a penalty is imposed for making a contract, such contract is a nullity. Smith on Cont., 249; 3 Am. & Eng. Enc. L., 872; 1 Dillon on Mun. Corp., 447; 1 Parson's on Contract, 458. The contract being illegal, the consumma-

tion of it could be enjoined by any taxpayer. 2 Dillon on Mun. Corp., 915–918, 922. In Cooley's Const. Lim., sec. 195, it is said "the disposition of the courts in this country is to confine municipalities within the limit the strict construction of the grant of powers of their charters will assign to them." In *Simrall* v. *City of Covington*, 90 Ky., 444, the rule of construction is thus clearly stated: "If there be a fair and reasonable doubt of the existence of the power, it should be resolved against the municipality. The scope of the delegated sovereignty is not to be enlarged by a liberal construction. These principles are elementary, and the citation of authority is unnecessary." The statute is awkwardly drawn, but an analysis makes the meaning perfectly clear, and that meaning is this: First, that no order shall be made for the issuance of a warrant unless the money is on hand to pay the same; second, that no warrant shall be issued unless the money is on hand to pay the same, and third, no debt or pecuniary liability whatsoever shall be incurred unless the money is on hand to pay the same. Three things are prohibited: First, the order for the issuance of the warrant; second, the issuance of the warrant, and, third, the contracting of a debt in any other manner; and the limitation, "unless there is in the hands of the treasurer, at said time, a sufficient amount of money to pay the same," applies to each one of them. If this be not the meaning of the statute, the prohibition against "in any other manner contracting any debt or pecuniary liability" is without force and has no meaning.

There has been great conflict of authority as to whether, under the power "to establish and regulate market houses and markets," which is the language used in the Greenville charter, a municipality has the power to prohibit sales at certain places or outside of the market limits. These authorities are collected in Dil. on Mun. Cor., sec. 386; Beach on Pub. Cor., sec. 1268; 14 Am. & Eng. Enc. L., p. 462. This court has never passed upon the question, and is at liberty to follow the line of authorities that seems to it to be the wisest. But, conceding the

power to exist, still the ordinance is void, because it is unreasonable, oppressive, partial, and in restraint of trade, and was enacted for the purpose of raising a revenue, and, being enacted under a charter which does not provide the mode and manner in which market houses may be established and regulated, the courts may declare it void. It is unreasonable and oppressive because it provides that no stall shall be leased for less than one month or more than twelve months, and that no person shall occupy more than two stalls, and because the prices fixed for the rent of stalls are exorbitant, because the building is entirely too small to accommodate the complainants and the others engaged in like business and in the sale of poultry.

WOODS, C. J., delivered the opinion of the court.

The original bill in this case was filed by appellees, citizens of and taxpayers in the municipality, against the city of Greenville, and had, as one of its principal objects, the determination of the validity of a certain contract made by said city with Mrs. Fannie Alexander for the purchase of the lot of land, and buildings situated thereon, at and for the sum of $6,800, the declared purpose of the city in making the purchase being to establish a market house in said building. The bill was afterwards amended, by making Mrs. Fannie Alexander, J. J. Harty and the Greenville Building & Loan Association parties, because of the fact that a very large amount of the purchase money agreed to be paid for the property had been stipulated, in the contract of purchase and sale, to be paid to the two last named parties. The prayer of the bill was that the contract be declared a nullity, and that the municipal ordinances authorizing it be held void, and the city be enjoined from making any further payments on the agreed purchase price. The decree of the court was in favor of the contention of complainants, and a decree perpetually enjoining the deferred payments was passed. From this decree the city of Greenville alone appeals.

There were other questions raised by the pleadings and passed

upon by the court favorable to the complainants, but under the view which we entertain of the action of the chancery court upon the question of the validity of the contract, we find it unnecessary to at all consider them. To obviate misconstruction by absolute silence on our part as to the decree of the court below enjoining perpetually the city authorities from attempting to force the complainants into the market house which had been contracted to be purchased from Mrs. Alexander, and from interfering with their business in any way, we think it proper to declare that this decree must be limited to the case then before the court, and that its only effect was and is to restrain the city from attempting to force the complainants to rent stalls in the Alexander house, and to carry on their business there, and to restrain the city from interfering with the business of complainants in any way. with the purpose and object of coercing them into abandoning their then places of business, and compelling them to carry on their business in said Alexander house. The findings of the court below do not indicate that that court was at all considering the power of the city to establish and regulate markets and market houses. The finding was "that the establishment of said market house (the Alexander house), and the adoption of the ordinance"—that is, the ordinance requiring complainants to rent stalls and carry, on their business in that house (a house charged in the bill and shown by the evidence to be inadequate for the purposes of a market house) under the provisions of the ordinance—are in restraint of trade.

The power "to establish and regulate markets and market houses" is expressly conferred on the city authorities in the twenty-eighth 'section of the city's charter, and that power the court below was not considering.

The fifty-seventh section of the charter of the city (acts of 1886, page 536), is as follows:

"SEC. 57. *Be it further enacted*, That it shall be unlawful for said city council, the mayor, or the clerk thereof, to order to

be issued or to issue any warrant or order on the city treasurer for the payment of money, or in any other manner to contract any debt or pecuniary liability, unless there is in the hands of the treasurer at said time, and that may be properly applied to the payment of said warrant, a sufficient amount of money to pay the same; and should any of the foregoing persons violate the provisions of this section, unless misinformed by the treasurer, he shall be deemed guilty of a felony, and shall be punished, on conviction thereof, by fine,'' etc.

The act is unskillfully drawn and with some lack of technical accuracy in the use of terms, and is, therefore, wanting in perfect clearness of meaning.    It is clear, however, that it is declared unlawful (1) for the city council, the mayor, or clerk thereof, to order to be issued any warrant or order on the city treasurer for the payment of money, unless there is then in the hands of the treasurer a sufficient amount of money, properly appropriable to the payment thereof, to pay the same; and (2) it is declared unlawful for any of these officials to issue any warrant or order on the city treasurer unless likewise there be sufficient money, at the time the warrant or order is issued, to pay the same; and (3) it is declared unlawful for the council, or any of the officials, in any other manner, to contract any debt or pecuniary liability unless likewise there be in the treasurer's hands at the time, and that may properly be applied to its payment, a sufficient sum of money to pay the same.

If this be not the proper rendering of its meaning, the prohibition of the contracting of any debt or liability unless there be ready money with which to pay, must be read out of the section. It is true that, in the ninth (seventh as above quoted) line of the section, the word "warrant" alone is used, but it is also true that the section speaks of the issuance of a warrant or other order for the payment of money or the contracting of a debt, whereas, in truth, they are only evidences of debt, and are mere means or methods of payment of a debt.    But it is manifest that if we read out of the charter the prohibition of the crea-

tion of debts or pecuniary liabilities unless there be money on
hand then to pay, because the unskilled hand which drew the
charter employs in the ninth (seventh, *supra*) line the single word
" warrant," in speaking of a sufficient amount of money being
on hand to pay the same, we shall be compelled also to read out
of the section all that which forbids the issue of an order on the
treasurer for the payment of money unless there be ready money
wherewith to make payment, because the word "order" is not
found in the ninth (seventh, *supra*) line.    By this sort of inter-
pretation, only the issue of warrants would be forbidden, and
orders for payment of money might be issued at the pleasure of
the council or city officials, and debts beyond the power of the city
to pay might likewise be created.    But all sound rules of inter-
pretation would be violated by giving the section such construc-
tion.    We must give effect, if possible, to each and every part
of the section, and so construe it as to fully carry out the legis-
lative intent, if that can be found from an examination of all
the terms of the act.    It seems clear to us that the purpose of
this section was to put the municipality upon a cash basis, by
forbidding warrants or orders for the payment of money to be
issued, or debts and pecuniary liabilities to be contracted, un-
less the money was, at the time the warrant or order was issued
or the debt or liability was contracted, on hand with the treas-
urer in sufficient amount to then pay the warrant or order or
satisfy the debt or pecuniary liability.    This view is strengthened
by reference to sections 62 to 69 of the charter, by which it was
provided that an issue of bonds by the city to prevent the en-
gulfing of the front of the city by the waters of the Mississippi
river could only be had after the legal voters of the municipal-
ity had, at the polls, conferred upon the city council authority
to preserve the very existence of the city by the creation of a
debt of that character.    But if the municipality is not thus
clearly forbidden to plunge the city into debt, and to us it
seems that it is, it is nevertheless true that if there is doubt as
to the legislative grant of power to contract debts, the doubt

must be resolved against the exercise of the doubtful grant of power. The charters of municipal corporations, like those of other corporations, are not to receive a latitudinarian construction.

*Affirmed.*